**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**EASTERN DIVISION**

J.A.S.G., et al.,

Petitioners,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

Respondents.

Case No. 5:26-cv-03510-DFM

ORDER DENYING PETITION

## I. INTRODUCTION

This case involves a single mother and her ten-year-old son ("Petitioners"). See Dkt. 8, First Amended Petition ("FAP") ¶¶ 1-2.[1] Petitioners came to the United States in 2024 to seek asylum; accepted pre-conclusion voluntary departure in 2025; became subject to a final order of removal in early 2026 upon moving to reopen their asylum proceedings; and were removed to Guatemala on June 26, 2026, less than 36 hours after initiating this habeas action.

[1] Unless otherwise specified, the use of "Petitioner" in the singular refers to Petitioner J.A.S.G. The Court granted in part—without prejudice to Respondents' ability to seek reconsideration—Petitioners' unopposed motion to proceed via pseudonym. See Dkt. 18.

In both their original Petition and the FAP, Petitioners challenge the revocation of their release and their re-detention under procedural due process (Count One); substantive due process (Count Two); the implementing regulations of the Immigration and Nationality Act ("INA") (Count Three); and the Administrative Procedures Act (Count Four). See Dkt. 1 ("Petition") ¶¶ 25-46; FAP ¶¶ 26-47. Petitioners request a writ of habeas corpus ordering their return to the Central District of California ("CDCA") and immediate release; permanent, prospective injunctive relief enjoining their re-detention absent certain procedural protections; declaratory relief; certain temporary relief; and attorney's fees under the Equal Access to Justice Act. See FAP at 23-24.

Petitioners also filed an Emergency Motion for a Temporary Restraining Order ("TRO"), requesting the Court order Respondents to release them from custody; enjoin Respondents from re-detaining them absent certain protections; and enjoin Respondents from removing them from the United States or transferring them outside of CDCA during this action. See Dkt. 2. As further discussed below, Petitioners later submitted other filings including a renewed TRO motion and a motion to supplement the TRO motion. See Dkts. 9, 15. Respondents opposed Petitioners' TRO Motion. See Dkt. 19. The Court held a hearing in this action on July 1. See Dkt. 25. Following the hearing, the parties filed supplemental briefs and supplemental replies. See Dkts. 27-30.

After consideration and for the reasons set forth below, the First Amended Petition is **DENIED**.

## II. BACKGROUND

The Court sets forth the facts of this case in detail.

### A. Petitioners' Entry and Release into the United States

Petitioners, a mother and her son, are citizens of Guatemala. See FAP ¶ 2. Petitioners entered the United States in December 2024 to seek asylum.

See id. Petitioner claims that she and her daughter, who is not a party to this action, were raped, abused, and threatened by powerful men involved with criminal gangs in Guatemala. See Dkt. 8-1 at 23, 26. Petitioner claims that a close family member was extorted and murdered in Guatemala, and that she and her family fear torture and death in Guatemala. See id. at 23, 25.

Shortly after entering the United States, Petitioners were detained by immigration authorities, placed into removal proceedings, and released on their own recognizance. See FAP ¶ 2; Dkt. 8-1 at 10 (Form I-220A Order of Release on Recognizance ("OREC") dated December 18, 2024). Petitioner was enrolled in an alternatives to detention program and placed on electronic GPS monitoring. See FAP ¶ 2; Dkt. 8-1 at 12-13. Petitioners allege that since their release, they have complied with all of their requirements, including attending check-ins, submitting identifying documents, and not associating with criminal activity. See FAP ¶¶ 2-3. During their release, Petitioners "grew connected" and "established significant ties" to their local community. See Dkt. 9 at 12, 19. The minor-child Petitioner attended school and Petitioner became a devoted member of a local church. See FAP ¶¶ 2, 37; Dkt. 8-1 at 21.

In July 2025, Petitioner was issued a new OREC, directing her to report back in July 2026. See FAP ¶ 2; Dkt. 8-1 at 17-19 (OREC dated July 30, 2025). As further discussed below, Petitioner was re-enrolled in the Intensive Supervision Appearance Program ("ISAP"), most recently on April 30, 2026.[2] See FAP ¶ 8.

---

[2] The Court ordered the parties to supplement the record with any ISAP re-enrollment documents and any notice of revocation or detention or other documents presented to Petitioners when they were taken into custody on June 24, 2026. See Dkt. 26. Neither party submitted any documents responsive to this order.

## B. Petitioners' Immigration Court Proceedings

Petitioners applied for asylum on June 9, 2025. See FAP ¶ 4. Petitioners allege that their immigration case was prejudiced by the ineffective assistance of the immigration counsel who represented them in asylum proceedings. See id. Petitioners allege that their prior counsel omitted key details from their application, never read Petitioner the full application in Spanish before it was submitted, dismissed and scolded Petitioner, threatened to report Petitioner to the judge, accused Petitioner of being part of a gang, filed a one-page declaration for Petitioner using an incorrect name and without reading it to her in Spanish, refused to help Petitioner prepare for her final immigration hearing, and otherwise prejudiced Petitioners' case. See Dkt. 1-1 at 4; Dkt. 8-1 at 23-27. Had prior counsel read the declaration to her in Spanish, Petitioner states that she "would have asked her to include more details about how the police refused to help us and pointed out that she wrote my name incorrectly." Dkt. 8-1 at 26.

Petitioners' immigration hearing was held in October 2025. See FAP ¶ 3. Petitioners allege that prior counsel arrived late for the hearing. See Dkt. 8-1 at 4, 24. Petitioner did not understand much of what was happening at the hearing. See id. at 25. Petitioner alleges that her prior counsel "talked to me alone and told me that the judge was closing my case, and I should accept going back to my country." Id. Petitioner alleges that after she asked why the IJ did not think there was enough evidence despite the evidence she had provided, prior counsel "got very angry and raised her voice at me, saying that I myself was part of a gang in my country and that is why I could not win my case." Id. Petitioner alleges that she:

> began crying because I could not understand how my attorney could accuse me of being part of a gang when I was fleeing the gang and powerful man that had killed my [close family member]. I have never supported a gang or made payments to a gang. I told

> the attorney that I could not go back to my country and asked how we could open the case again if the judge had closed it, but she told me that I had no choice and there was nothing else that could be done for my case. She took me back to the judge and had me raise my hand and promise to return to Guatemala. I could not believe what was happening, but I did not know what to do but to follow the attorney's instructions.

Id.

Petitioner alleges that prior counsel failed to advise her that she could appeal the IJ's decision. See id. at 26. Petitioner alleges that had she been told that an appeal was an option if she thought the IJ's decision was incorrect, she "would have insisted to go this route, as [she] cannot be safe in Guatemala and want[s] to pursue [her] request for safety in the United States." Id. at 25. Petitioners allege that prior counsel "forced them to withdraw their application for asylum and accept pre-conclusion voluntary departure at their individual hearing" and "threatened" them to accept voluntary departure. See FAP ¶ 4.[3]

The IJ entered an order for pre-conclusion voluntary departure, ordering Petitioners to depart by February 26, 2026, and stating that Petitioners' "[f]ailure . . . to depart by the required date will result in an alternate order of removal to GUATEMALA taking effect immediately." Id.; Dkt. 11, Ex. A (order withdrawing without prejudice Petitioners' applications for relief and granting pre-conclusion voluntary departure under 8 U.S.C. § 1229c(a)).[4] The

---

[3] Petitioners' prior counsel contests Petitioner's allegations of ineffective assistance. See Dkt. 8-1 at 29-30.

[4] The Supreme Court has described voluntary departure as follows:

> Voluntary departure . . . allows the Government and the alien to agree upon a quid pro quo. From the Government's standpoint, the alien's agreement to leave voluntarily expedites the departure process and avoids the expense of deportation—including

IJ's order stated that "[Petitioner] was advised of the limitation on discretionary relief, the consequences for failing to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider." Dkt. 11 at 6. The IJ's order further stated:

> If [Petitioner] fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and [Petitioner] shall be ineligible, for a period of 10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the [Immigration and Nationality] Act . . . If [Petitioner] files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated . . . .

Id. at 7.

On January 27, 2026, Petitioners, proceeding with new counsel, filed a motion to reopen ("MTR") their immigration proceedings based on ineffective assistance of counsel. See Dkt. 15 at 8. As the Supreme Court has described it, "[a] motion to reopen is a form of procedural relief that asks the Board to change its decision in light of newly discovered evidence or a change in circumstances since the hearing." Dada, 554 U.S. at 12 (internal quotation

---

> procuring necessary documents and detaining the alien pending deportation. The Government also eliminates some of the costs and burdens associated with litigation over the departure. With the apparent purpose of ensuring that the Government attains the benefits it seeks, the [INA] imposes limits on the time for voluntary departure . . . and prohibits judicial review of voluntary departure decisions. Benefits to the alien from voluntary departure are evident as well. He or she avoids extended detention pending completion of travel arrangements; is allowed to choose when to depart (subject to certain constraints); and can select the country of destination. And, of great importance, by departing voluntarily the alien facilitates the possibility of readmission.

Dada v. Mukasey, 554 U.S. 1, 11 (2008) (internal citations omitted).

marks and citation omitted). The parties now agree that Petitioners' filing of the MTR during the voluntary departure period resulted in Petitioners' alternate order of removal taking effect immediately and Petitioners' 90-day removal period starting. See Dkt. 11 at 6-7; Dkt. 28 at 6; Dkt. 30 at 5-6.[5]

On April 24, 2026, the IJ denied Petitioners' MTR; according to Petitioners, the IJ did not address any of Petitioners' allegations of ineffective assistance. See Dkt. 1-1 at 5; Dkt. 15 at 8; FAP ¶ 7. The IJ stated that "[Petitioners] were represented by counsel and knowingly and voluntarily withdrew the I-589 application [for asylum] and sought pre-conclusion voluntary [departure] with an understanding of the legal consequences of such a decision." Dkt. 8-1 at 40-41 (Petitioners' appeal quoting the IJ's order).

Six days later, Petitioners, proceeding through pro bono counsel, appealed the IJ's denial of their MTR to the Board of Immigration Appeals ("BIA"). See Dkt. 8-1 at 5. The record before the Court indicates that Petitioners' BIA appeal of the IJ's denial of their MTR remains pending. See id. Nothing in the record indicates that the BIA has granted a stay of removal pending its review. See, e.g., Dkt. 19 at 4. The record before the Court indicates that Petitioners' counsel did not attempt to seek a stay of Petitioners' removal before filing their habeas petition in this Court.[6]

---

[5] This was not the government's position originally.

[6] At the July 1 hearing, counsel stated that she did not attempt to seek a stay of Petitioners' removal before June 25, 2026. Counsel explained that there was no indication that Petitioners' removal would be executed pending their BIA appeal. Counsel's basis for not seeking such a stay remains unclear to the Court. See Dada, 554 U.S. at 21 (highlighting that noncitizens who file a motion to reopen during a voluntary departure period "may request a stay of the order of removal . . . and, though the BIA has discretion to deny the motion for a stay, it may constitute an abuse of discretion for the BIA to do so where the motion states nonfrivolous grounds for reopening").

### C. Petitioners' Post-Removal Order Check-Ins

Petitioners allege that after the IJ denied their MTR, they were asked to appear at the ISAP office in Chatsworth on April 30, 2026. See FAP ¶ 8. Petitioner was placed on a GPS ankle monitor and re-enrolled in ISAP with home and office check-ins. See id. That same day, Petitioners were instructed to report immediately to the ICE office in Los Angeles. See id. Petitioners' counsel accompanied them to both check-ins, introduced herself to the ISAP/ICE officers as Petitioners' attorney, and showed them copies of a signed Form G-28, Notice of Entry of Appearance as Attorney for the Petitioners. See Dkt. 15 at 8. At the ICE office, counsel provided the officer with a copy of Petitioners' BIA appeal. See Dkt. 8-1 at 5. Counsel states that the ISAP officer made copies of the documents and the ICE officer kept the documents. See Dkt. 15 at 8-9. Counsel states that the ICE officer "confirmed that the appeal was pending and stated that [Petitioners] did not need to return to ICE unless their ISAP officer instructed them to do so." Dkt. 8-1 at 5.

Petitioner continued to keep her ankle monitor charged. See FAP ¶ 7. In May and June 2026, Petitioners' counsel accompanied Petitioners to four different check-ins. See id. ¶¶ 7-11; Dkt. 8-1 at 5-6; Dkt. 15 at 9. Petitioner reported to the ISAP office at least five times in May and June 2026. See FAP ¶ 9. Petitioner would sometimes receive a call the evening before telling her to report to the ISAP office the next day. See id. ¶¶ 7-11. In one instance, Petitioner was scheduled to report to the ISAP office on May 14, but on May 12, was called and told that she had missed an appointment the day before, and that she had to come in the next day. See id. ¶ 7. On May 13, Petitioner reported as requested and was told that everything was fine and she should report back in June. See id. On May 14, Petitioner was again called by ISAP who told her that she needed to report the next morning. See id. ¶ 8. On May 15, Petitioner reported back; an officer told her that they were doing her a

favor by not arresting her immediately, but she should return that afternoon with her passport and her son's birth certificate. See id. They warned Petitioner that they knew where she lived, so they could always come and arrest her. See id. Petitioner returned that afternoon as instructed. See id.

On several of these occasions, counsel accompanied Petitioner and introduced herself to the officers as Petitioners' attorney and explained that Petitioners' BIA appeal was pending. See Dkt. 15 at 8-9. At the June 11 check-in, the ISAP officer confirmed counsel's name and email address and informed counsel that she would list her as Petitioner's attorney on the ISAP application. See id. at 9. During this time, Petitioner submitted documents to immigration authorities as requested. See FAP ¶ 9.

On June 23, Petitioner reported to the ISAP office in Chatsworth for a check-in. See id. ¶ 11. The officer told Petitioner that she would be sending her documents to sign electronically through the app. See id. Petitioner was concerned because she cannot read or write or operate the app without assistance, and she was not able to open and sign the documents when she got home. See id. Petitioner's adult daughter called the ISAP office; the officer told her that Petitioner should report back the next day or she would have a violation. See id.

**D. Petitioners' Re-Detention and Removal**

On June 24, Petitioner reported back to the ISAP office. See id. Petitioners' attorney was unable to accompany her. See Dkt. 1-1 at 7. Counsel suggested that Petitioner take someone with her to help. See id. Petitioner, who cannot read or write in any language, brought her minor son, who can read and understand Spanish and some English, to help her. See id.; Dkt. 15 at 6. At some point, Petitioner's sister received a call from someone at ISAP instructing her to bring Petitioners' suitcase to the Los Angeles ICE office because Petitioners were going to be removed. See FAP ¶ 12. Petitioners allege

that though Respondents made this call, they did not call Petitioners' counsel. See Dkt. 30 at 10.

Petitioners were informed that their case was "closed" and therefore they would be arrested and removed. See Dkt. 15 at 6. Petitioner requested to speak with her attorney, as she did not understand why her case was closed or what had changed. See id. Petitioner reminded the officers that she was illiterate and wanted her attorney informed. See id. Petitioner alleges that the officers present denied her the opportunity to speak with counsel, telling her again that her case was closed and there was nothing an attorney could do to help her. See id. Petitioner's GPS ankle monitor was removed, and Petitioners were taken into custody in another building in Chatsworth. See id. Petitioner alleges that her phone was taken away from her, in which she had her counsel's and other contacts' telephone numbers. See id. at 7.

Around 11:00 a.m., Petitioner called a relative to request that they drop off Petitioners' medications and a sweater. See Dkt. 1-1 at 7. Petitioner confirmed that she and her son were in Department of Homeland Security ("DHS") custody. See id. Respondents state that Petitioners were arrested at the ICE ERO sub-office in Van Nuys at 1:27 p.m. See Dkt. 19-1 ¶ 11.

At some point in the late afternoon, Petitioners were transported to a hotel in Los Angeles, where they remained for several hours. See Dkt. 15 at 7; Dkt. 19-1 ¶ 12. ICE agents stayed inside the hotel room with Petitioners. See Dkt. 15 at 7. Around 6:00 p.m., Petitioner called her adult daughter to inform her that they had been transferred to the ICE facility in downtown Los Angeles. See Dkt. 1-1 at 7.

At 10:17 p.m. on June 24, 2026, Petitioners' counsel filed the Petition in this matter as well as a motion for a temporary restraining order.

In the early morning hours of June 25, 2026, Petitioners were put on an airplane for transit out of the Central District of California. See Dkt. 15 at 7

("At approximately 2am PT on June 25, 2026, Petitioners were taken from the hotel and put on an airplane"); Dkt. 19-1 ¶ 13 ("On June 25, 2026, at 4:25 a.m. PDT, [Juvenile & Family Management Transportation & Compliance Unit] JFMTCU Contractor transferred [Petitioners] out of [CDCA] and enroute to Alexandria, Louisiana for a scheduled repatriation flight to Guatemala."). Petitioner asked an accompanying ICE agent where they were going; she said they were going to Texas. See Dkt. 15 at 7. Petitioners report that they took two airplanes, one of which may have been to Alexandria, Louisiana. See id. Respondents tell the Court that Petitioners were flown to Louisiana. See Dkt. 19-1 ¶ 13.

At 10:11 a.m. on June 25, 2026, this case was assigned to the undersigned Magistrate Judge. See Dkt. 6. Minutes later, the Court issued the Notice of General Order 26-05 and Briefing Schedule. See Dkt. 7. This Notice directed the Clerk to "immediately" serve the habeas petition filed in this case upon Respondent by emailing a copy of the habeas petition and the Notice to a designated Department of Justice email address. See id. at 1-2. The Notice also stated that "Respondent shall provide at least two court days' notice to the petitioner, petitioner's counsel, and the Court of its intent to remove the petitioner from the Central District of California." Id. at 2.

At approximately 11:00 a.m., Petitioner called her adult daughter and informed her that Petitioners had been flown to Texas. See FAP ¶ 12. Petitioners' daughter reported this to Petitioners' counsel. See Dkt 8-1 at 7.

At approximately 12:45 p.m., Petitioners' counsel unsuccessfully attempted to file applications for a stay of Petitioners' removal with DHS. See FAP ¶ 12; Dkt. 15 at 10-11 (counsel stating in her declaration that: "[her] colleague, who had gone to file Petitioners' applications for stay of removal, informed [her] that the ICE office refused to take the stay of removal application. [Her] colleague informed [her] that he spoke to a supervisory

officer who told him that as Petitioners were now in Harlingen, Texas, it was outside of their jurisdiction so they could not accept the applications for consideration. The officer did not offer [Petitioners' counsel's] colleague an alternate place to file the applications.").

Meanwhile, Petitioners were taken to another hotel where ICE agents stayed with them in the room. See Dkt. 15 at 7. Petitioners were told that they would soon be removed to Guatemala. See id.

At approximately 2:46 p.m., Petitioners' counsel filed the First Amended Petition. See FAP. Minutes later, counsel filed a Renewed Motion for TRO. See Dkt. 9 ("TRO Motion").

At approximately 5:22 p.m., the Court ordered Petitioners to lodge a copy of the IJ's October 2025 order. See Dkt. 10. Petitioners lodged a copy of the order a few hours later. See Dkt. 11.

The next day, in the early hours of June 26, 2026, Petitioners were removed to Guatemala. See Dkt. 15 at 7 ("At approximately 2am PT on June 26, 2026, Petitioners were put on an airplane and flown to Guatemala City."); Dkt. 19-1 ¶ 14 ("On June 26, 2026, at 5:15 a.m. CDT, JFMTCU Contractor transferred custody of [Petitioners] to Alexandria ICE Air Operations at Alexandria International Airport for repatriation to Guatemala. Their flight departed Alexandra, Louisiana for Guatemala at 6:28 a.m. CDT."). Due to the lack of notice of their detention and the haste of their deportation, Petitioners were unable to get any of their medications or belongings or prepare their affairs before they arrived in Guatemala. See Dkt. 15 at 7. Petitioners were removed without any opportunity to say goodbye to their daughter/sister. See Dkt. 28 at 9. Petitioners describe the result of Respondents' actions as follows: "[t]he result – an Indigenous, illiterate single mother and her third grader son detained and disappeared from their loved ones and community in California, and removed from the United States under the cover of night without having

an opportunity to speak to their legal counsel or any neutral adjudicator ever making a decision on the merits of their request for asylum." Id. at 5.

A few hours after Petitioners were removed from the United States, at approximately 7:45 a.m., the Court issued an order setting a briefing and hearing schedule on Petitioner's TRO Motion and ordering that Petitioners not be removed from the United States until further Court order. See Dkt. 13. At this point, the Court was unaware that Petitioners had already been removed from the United States.

At approximately 10:05 a.m. on June 29, 2026, Petitioners alerted the Court that they had been removed from the United States on June 26, before the Court issued its order. See Dkt. 15.

### E. Subsequent Procedural Background

On June 29, Petitioners moved to supplement their TRO Motion. See Dkt. 15. Later that day and per the Court's order, Respondents filed a response to Petitioners' TRO Motion. See Dkt. 19. On June 30, Petitioners filed a reply. See Dkt. 22. The Court held a hearing on July 1, 2026. See Dkt. 25. On July 2, Respondents filed a supplement to their response. See Dkt. 23.

On July 2, the Court ordered the parties to file supplemental briefs addressing: (1) whether this action is moot; (2) whether DHS was required to provide Petitioners with access to counsel upon their arrest on June 24; and (3) what remedies, if any, are available should the Court conclude that Petitioners' rights were violated. See Dkt. 26. Petitioners and Respondents each filed supplemental briefs and supplemental replies. See Dkts. 27-30.

## III. DISCUSSION

The parties dispute whether Petitioners' removal renders this action moot. Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies. See Deakins v. Monaghan, 484 U.S. 193, 199 (1988). "At any stage of the proceeding a case becomes moot when 'it

no longer present[s] a case or controversy under Article III, § 2 of the Constitution.'" Abdala v. INS, 488 F.3d 1061, 1063 (9th Cir. 2007) (quoting Spencer v. Kemna, 523 U.S. 1, 7 (1998)). Federal courts cannot exercise jurisdiction over a case if it is moot, but "[t]he burden of demonstrating mootness is a heavy one." West v. Sec'y of Dep't of Transp., 206 F.3d 920, 924 (9th Cir. 2000) (citation omitted).

"Deportation from the United States after filing a habeas petition does not necessarily moot a petitioner's claim." Abdala, 488 F.3d at 1063. "For a habeas petition to continue to present a live controversy after the petitioner's release or deportation, however, there must be some remaining 'collateral consequence' that may be redressed by success on the petition." Id. at 1064 (citing Spencer, 523 U.S. at 7). Thus, in order for a removed non-citizen's habeas petition to present a live case or controversy, the non-citizen must "(1) have filed the habeas petition when they were in custody and (2) suffer continuing collateral consequences as a result of the deportation (3) that are redressable by the relief sought in the habeas petition." Chaudhry v. Barr, No. 19-0682, 2019 WL 3713762, at *12 (E.D. Cal. Aug. 7, 2019), report and recommendation adopted in part, rejected in part, No. 19-682, 2021 WL 568165 (E.D. Cal. Feb. 16, 2021) (citing Abdala, 488 F.3d at 1063-64).

It is undisputed that Petitioners were in custody when they filed their petition for writ of habeas corpus. The Court thus turns to collateral consequences.

Petitioners identify the following "collateral consequences" of their removal: (1) the 10-year statutory bar from re-entering the United States under 8 U.S.C. § 1182(a)(9)(A)(ii); (2) their sudden separation from their daughter/sister; and (3) obstacles to meaningfully pursuing their MTR while in hiding in a country where they face possible persecution. See Dkt. 28 at 8-9. Petitioners seek an order compelling the government to return Petitioners to

the CDCA and release them from custody, as well as prospective injunctive relief preventing the government from re-detaining them without a hearing before a neutral adjudicator. See id. at 15.

Beginning with the statutory bar from re-entry, Petitioners do not in the FAP contest the validity of their underlying removal order. Rather, the FAP focuses on Petitioners' detention. Thus, even if the Court were to grant Petitioners' requested relief, the Court understands that Petitioners would remain subject to a valid and final removal order to Guatemala, the execution of which would subject them to the same statutory bar from re-entry. See 8 U.S.C. § 1182(a)(9)(A)(ii). Both the INA and Ninth Circuit authority prevent the Court from enjoining the Government's exercise of discretion to execute Petitioners' removal per their valid, final, and uncontested removal order. See 8 U.S.C. § 1252(g); Rauda v. Jennings, 55 F.4th 773, 777, 779-80 (9th Cir. 2022). Thus, the Court cannot grant effective relief on Petitioners' first asserted collateral consequence.

The Court concludes that the second and third asserted collateral consequences also flow from Petitioners' removal, not their allegedly unlawful re-detention. The Court understands Petitioners' daughter/sister to be located in this district. Thus, if Petitioners were returned to this district and released from custody, they would, presumably, be able to reunite with their daughter/sister. Additionally, if returned to this district, Petitioners would obviously no longer be hiding in Guatemala: the country in which they claim to face persecution and obstacles to litigating their MTR. In that sense, it appears that Petitioners' requested relief could, if granted, at least partially redress Petitioners' latter two asserted collateral consequences. However, the Court is wary of ordering Petitioners' requested relief under these circumstances.

Petitioners contend that "[t]his Court has the authority to order the return and release of Petitioners while their motion to reopen is pending and should do so, not only for Petitioners' sake but also to show Respondents that they cannot flout due process by quickly and unlawfully removing noncitizens." Dkt. 28 at 6. Petitioners argue that "Respondents should not be rewarded for quietly and quickly arresting and deporting an illiterate indigenous mother and 10-year-old boy who have been torn apart from their daughter and sister." Dkt. 30 at 12. But Petitioners were removed by the terms of a valid and final order of removal that was not stayed by any order of either this Court, the BIA, or the Ninth Circuit Court of Appeals.[7]

---

[7] CDCA General Order 26-05 (the "GO 26-05") provides that, during the pendency of a § 2241 Immigration Petition like this one, the government shall provide at least two court days' notice to the petitioner, their counsel, and the Court of the government's intent to remove the petitioner from the Central District of California. See Dkt. 7 at 6. Petitioners argue that this requirement takes effect immediately upon the filing of a petition—in this case, at approximately 10:17 p.m. on June 24, several hours before Petitioners were removed from the district. See Dkt. 22 at 5.

Respondents argue that this two days' notice obligation is not triggered in any particular action until Respondents are served with the petition and any applicable order. See Dkt. 23 at 2-4. Respondents argue that Petitioners' position is contrary to GO 26-05's terms and the fundamental notice and service requirements of the Federal Rules. See id.

Here, the record shows that the Court did not issue its Notice of General Order 26-05 in this case until after 10:00 a.m. on June 25. See Dkt. 7. That notice directed the Clerk to "immediately" serve the habeas petition filed in this case upon Respondent by emailing a copy of the habeas petition and the Notice to a designated Department of Justice email address. See id. at 1-2. The record also indicates that Petitioners' counsel emailed copies of the Petition, TRO motion, and other documents to the United States Attorney's Office for the Central District of California at 8:03 a.m. on June 25, 2026. See Dkt. 15 at 9-10; Dkt. 19-1 ¶ 13.

In support of its argument that the Court has the authority to order Petitioners returned to the United States, Petitioners invoke the All Writs Act, 28 U.S.C. § 1651, and point the Court to various other cases where courts have ordered individuals returned. See Dkt. 22 at 11-13; Dkt. 28 at 13-15; Dkt. 30 at 8-9. Based on the Court's review, Petitioners' circumstances, while grave, are distinguishable from those of the noncitizens underlying the cases Petitioners cite. See J.G.G. v. Trump, 25-766, 2026 WL 391937 (D.D.C. Feb. 12, 2026) (concerning a class of Venezuelans who had been deported in defiance of a court order); Noem v. Abrego Garcia, 145 S. Ct. 1017 (2025) (concerning a petitioner who had been removed to El Salvador notwithstanding that he was subject to a withholding order forbidding his removal to El Salvador); Juarez v. Noem, No. 26-801, 2026 WL 799976 (E.D. Cal. Mar. 23, 2026) (concerning a petitioner who was removed while she had active Deferred Action for Childhood Arrivals status); Ramos-Lopez v. Bondi, 26-1175, 2026 WL 1745700, at *9 (D. Md. June 17, 2026) (concerning a petitioner who was removed while he had active Special Immigration Juvenile Status and deferred action status); Singh v. Waters, 87 F.3d 346, 349 (9th Cir. 1996) (concerning a petitioner who was removed in violation of an IJ's order staying deportation and after interference with his right to counsel); Yaide v. Wolf, No. 19-7874, 2019 WL 6896148, at *1 (N.D. Cal. Dec. 18, 2019) (concerning a noncitizen who, though in transit, had not yet arrived back in his country of origin when a district court issued an emergency order temporarily enjoining the noncitizen's removal).

---

Thus, the record in this matter does not show that the government received any notice of this action until after Petitioners had already been removed from this District.

Here, by contrast, two noncitizens were removed by the terms of a final, valid order of removal and in the absence of a stay, withholding order, or any other form of immigration relief. Ultimately, the Court agrees with Respondents' characterization that "Petitioners' present objection therefore stems from their own calculated decision – to file a motion to reopen." Dkt. 29 at 3. The Court acknowledges that the Supreme Court has described the decision of whether to file a motion to reopen and have voluntary departure deemed withdrawn as "a hard choice." Dada, 554 U.S. at 18. And yet it is a choice that Petitioners elected to make. The Court cannot undo Petitioners' removal per a valid and final removal order and order the Government to return Petitioners to the United States under these circumstances.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Petitioners' First Amended Petition is **DENIED**. Given the Court's disposition on the First Amended Petition, all pending motions are likewise **DENIED**. The Court will enter Judgment accordingly.

Date: September 2, 2026

DOUGLAS F. McCORMICK
United States Magistrate Judge